**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| INTERMET CORPORATION, et al., | ) | Case No. 08-11859(KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | **Re: Dkt No. 1376** |

## MEMORANDUM OPINION

Pending before the Court are multiple motions arising from the unfortunate circumstance that Debtors were unable to proceed with the sale of their assets which was an important element of the implementation of their confirmed plan of reorganization. What once appeared to be a remarkable, consensual conclusion to a case which arose in the dark days of the automotive industry has instead turned into a hard fought conflict pitting the secured lenders who seek liquidation through chapter 7 of the Code against the Debtors and the Official Committee of Unsecured Creditors ("the Committee") who seek to implement the plan of confirmation. The facts and the law compel a ruling for the Debtors and the Committee.

## THE RELEVANT BACKGROUND

Time does not permit a lengthy recitation of the entire case and thus the Court will address only the most salient background facts. The parties involved in this case are all too familiar with the events and circumstances leading to this ruling. For a more comprehensive discussion of the background, the Joint Chapter 11 Plan of Intermet Corporation and Its Affiliated Debtors and Debtors in Possession as Confirmed (the "Plan") (D.I. 1041) is useful.

It is, however, the aftermath of the Plan which brings the parties before the Court at this time.

On August 12, 2008 (the "Petition Date"), Debtors sought relief under chapter 11 of the Bankruptcy Code. Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The United States Trustee for the District of Delaware appointed the Committee on August 19, 2008.

Extensive negotiations with the First Lien Agent, certain supporting First Lien Lenders (including CapitalSource Finance) and certain supporting Second Lien Lenders (collectively, the "Supporting Parties"), led to the Chapter 11 Plan Support Agreement, dated June 4, 2009 (the "Plan Support Agreement") with the Supporting Parties. Pursuant to the terms of the Plan Support Agreement (including a term sheet), Debtors and the Supporting Parties agreed, among other things, (i) to support a chapter 11 plan that provided for the orderly liquidation in the event no going concern sale was consummated, (ii) that Debtors would pay $20 million to the First Lien Agent to be distributed ratably to First Lien Lenders in partial repayment of the principal amount outstanding under the First Lien Prepetition Credit Agreement, (iii) that Debtors' use of cash collateral under the Cash Collateral Order be extended from June 30, 2009 through the earlier of (a) termination of the Support Agreement and (b) July 31, 2009, and (iv) that distribution of a minimum of $500,000 (the "GUC Cash") would be reserved for the benefit of unsecured creditors even in the event that these cases were converted to chapter 7. On June 5, 2009, the Court entered the Order approving the Plan Support Agreement (D.I. 1066).

On July 14, 2009, the Court entered an order (Docket No. 1221, the "Confirmation Order") confirming the Chapter 11 Plan. Debtors and the First Lien Prepetition Agent (the "First Lien Agent"), on behalf of the First Lien Prepetition Lenders (the "First Lien Lenders"), jointly proposed the Chapter 11 Plan (the "Plan"). The Plan was supported by the Creditors' Committee and accepted by 100% of Section 503(b)(9) creditors, 76% in amount of First Lien Lenders, a majority in amount of Second Lien Prepetition Lenders and approximately 90% in number and 94% in amount of unsecured creditors who voted on the Chapter 11 Plan.

Pursuant to the Plan, the Court approved the sale of all of Debtors' assets to Revstone Industries, LLC ("Revstone") on the terms in an asset purchase agreement (the "APA"). Order entered July 14, 2009 (D.I. 1224). Revstone did not consummate the APA.

The Plan provides that, failing consummation of the sale of all or substantially all of Debtors' assets within 10 business days of confirmation (the "Plan APA Deadline"), Debtors' assets will be transferred on the Effective Date to the Lender Liquidating Trust. Plan, Articles VI.A and VI.C.1(b). At Debtors' request, the Court granted several extensions of the Plan APA Deadline, which expired on August 31, 2009. See Docket Nos. 1282, 1290, 1298, 1282, 1318 and 1341. Debtors must therefore transfer the assets to the Lender Liquidating Trust under the Chapter 11 Plan as the Plan APA Deadline is not being extended. Plan, Articles VI.A and VI.C.1(b).

To establish the Lender Liquidating Trust, the Lender Liquidating Trust Agreement, which the Court recently approved as amended on August 21, 2009 (D.I. 1337), must be executed by and among Debtors, the Lender Liquidating Trustee and the GUC Liquidating Trustee. The Lender Liquidating Trustee, designated in connection with confirmation of the Plan, resigned. In subsequent discussions regarding a substitute, the First Lien Agent asked Debtors' CEO, Robert Tamburrino, to consider the position. More recently, Scouler & Company has agreed to serve as the Trustee to the Lender Liquidating Trust, and Mr. Tamburrino has agreed to assist Scouler & Company.

## THE PENDING MOTIONS

The background facts have resulted in the filing of the following motions:

1. Motion by the Official Committee Of Unsecured Creditors for Order Further Implementing and Enforcing (I) 9019 Order and (II) Cash Collateral Order and Segregating Amounts Required to Satisfy Lenders and Debtors Obligations Arising Thereunder (the "Committee Motion") (D.I. 1350).

2. Emergency Motion of CapitalSource Finance to Convert Chapter 11 Case to a Case Under Chapter 7 (the "Conversion Motion") (D.I. 1352).

3. Debtors' Motion for Order Pursuant to 11 U.S.C. Sections 105 and 1142 Finding All Conditions Precedent to Consummation of Confirmed Chapter 11 Plan Have Been Satisfied (the "Debtors' Motion") (D.I. 1361).

The Committee's Motion is moot because, as the Court has indicated, the Debtors' Motion will be granted. The Court will deny the Conversion Motion, having granted the Debtors' Motion.

## DISCUSSION

The Plan provides for certain conditions precedent to the Effective Date of the Chapter 11 Plan that must be satisfied or waived. Specifically, Article X.B of the Plan delineates the following preconditions:

(1)  Confirmation shall have occurred and the Confirmation Order shall have been entered by the Bankruptcy Court.

(2)  The Confirmation Order shall have become a Final Order.

(3)  There shall not be in effect on the Effective Date any (i) Order entered by a U.S. court or (ii) any order, opinion, ruling or other decision entered by any other court or governmental entity or (iii) United States or other applicable law staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan.

(4)  All other actions and documents necessary to implement the Plan shall have been effected or executed, including execution of the Liquidating Trust Agreements in the form and substance satisfactory to the Proponents; provided, however, that the GUC Liquidating Trust Agreement shall be in form and substance satisfactory solely to the Debtors and the Creditors' Committee or GUC Liquidating Trustee, as applicable.

(5)  At no time shall the total aggregate amount to be paid on the Effective Date and/or reasonably anticipated to be paid after the Effective Date in respect of Administrative Expense Claims (including Professional Fee Claims and Creditors' Committee Members' Expenses, to the extent applicable in accordance with the Final Cash Collateral Order) and 503(b)(9) Administrative Expense Claims be greater than $11 million plus a 5 percent variance unless the First Lien Prepetition Agent, in its sole and absolute discretion, consents in writing to the waiver of such condition. For the avoidance of doubt, in no

event shall the unpaid amounts in the preceding sentence to be reduced by the Carve Out (as defined in the Final Cash Collateral Order).

(6) The Liquidating Trust Agreements shall have been fully executed and (i) the Lender Liquidating Trust Assets (excluding GUCLT Wind Down Cash) shall have been delivered to the Lender Liquidating Trust and Iii) the GUCLT Wind Down Cash, GUC Cash, Excluded Actions and Trust C Interests shall have been delivered to the GUC Liquidating Trust.

The parties agree that condition nos. 1, 2 and 3 have been fully satisfied. The dispute centers on nos. 4, 5 and 6.

## **The Cap**

The most vigorously contested issue at the hearing was whether the Debtors had exceeded the administrative expense cap of $11.5 million. The Court had the benefit of the testimony of Robert Tamburrino, Debtors' CEO, the testimony of Mr. Carlin Adrianopoli of FTI Consulting (the First Lien Lenders' financial advisor) and exhibits which the witnesses discussed at length in both their direct and cross examinations. Both witnesses were thoughtful and knowledgeable and presented divergent views and testimony on Debtors' administrative expenses position. The Court must summarize the extensive testimony because despite their strongly disputed positions, all parties agree that immediate action is necessary.

Debtors assert that the administrative expenses through August 27, 2009, total $8.8 million, well within the Cap. The First Lien Lenders contend that the administrative expenses far exceed the Cap. The principal bases for the differing positions are attorneys' fees, environmental issues and severance obligations.

Severance Obligations.  The Court agrees with Debtors that there will be no administrative expenses arising from the severance of employees because Debtors' assumption is correct – the customers who depend upon Debtors' continuing operations have agreed to cover severance costs which otherwise would exceed $1.8 million.

Attorneys' Fees.  Debtors have ascribed $1.7 million to professional fees while the First Lien Lenders argue that the amount far exceeds the $1.7 million when taking into account the fees accrued but paid in the post-Confirmation period (July 17 - August 31).  The Court agrees with the Debtors that fees paid will not be administrative expenses at the Effective Date because such fee obligations are not outstanding.  The Plan is clear that the Cap is measured by "the total aggregate amount to be paid on the Effective Date...."  Plan, Article X.B.  Clearly, amounts paid prior to the Effective Date do not count against the Cap.

Environmental Claims.  The First Lien Lenders take strong exception to Debtors' assertion that no administrative claim amount should be attributed to environmental claims on the assumption that letters of credit cover environmental costs.  The First Lien Lenders contend that Debtors should reserve $1.4 million for environmental administrative claims. Mr. Adrianopoli of FTI Consulting was an effective witness for the First Lien Lenders.  It is here, however, that the Court gives greater weight to the testimony of Mr. Tamburrino whose knowledge of the Debtors' business and state of affairs and the Court's heightened respect for his knowledge of Debtors, ability and credibility take command.  As an aside, the First Lien Lenders have shown like respect for Mr. Tamburrino – all indications are that they

wanted him to serve as the Trustee for the Lenders Liquidating Trust. Mr. Tamburrino testified without reservation that the environmental claims should be afforded no reserve. The Plan provides that the Cap shall include amounts "reasonably anticipated to be paid after the Effective Date in respect of Administrative Expense Claims...." Mr. Tamburrino testified unequivocally that he does not expect environmental problems to create a problem and accordingly the Court is satisfied that the anticipation of claims is not "reasonably anticipated".

## Execution of the Liquidating Trust Agreements

Debtors have proposed Scouler & Company to serve as the Trustee for the Lenders Liquidating Trust, and Scouler & Company is prepared to serve as such. The First Lien Lenders object on the grounds that it is their sole right before the Effective Date to choose the trustee and that their choice of the trustee, Brad Scher, refused to serve. The First Lien Lenders would have the Court believe that the Plan therefore fails. They are wrong. The Plan provides (Article IV,C.1.(c)):

> In the event the Lender Liquidating Trustee is no longer willing or able to serve as trustee, then the successor shall be appointed by the Holders of Trust A Interests, or as otherwise determined by the Bankruptcy Court....

The First Lien Lenders argue that because the Trust A Interests do not exist until after the Effective Date, the foregoing provision is a post-Effective Date remedy. There can be no Effective Date without a trustee in place and if the First Lien Lenders do not choose a trustee there is no remedy, according to the First Lien Lenders. Thus, by not choosing a

trustee the First Lien Lenders argue that they can render the Plan a nullity by failing to take action. "[O]r as otherwise determined by the Bankruptcy Court" is the remedy for the First Lien Lenders' inertia. The First Lien Lenders also argue that Scouler & Company is not an adequate Trustee. The Court is satisfied that Scouler & Company has the requisite experience in reorganization and trustee work. Although their experience in the automotive industry is limited, with the assistance of Mr. Tamburrino who has agreed to serve for at least 60 days to assist Scouler & Company, and the First Lien Lenders' entitlement to replace Scouler & Company if they choose, the First Lien Lenders as well as the Debtors' post-Confirmation estate are fully protected. Accordingly, the Court finds that Scouler & Company is an appropriate trustee. The resolution of the appointment of a trustee for the First Lien Liquidating Trust paves the way for the sole remaining condition precedent, the execution of the trust agreements.

### The Bankruptcy Code Expressly Authorizes the Court to Order that the Chapter 11 Plan Be Effectuated

The Bankruptcy Code provides that "any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a). Section 1142(b) of the Bankruptcy Code provides that "[t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or deliver of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act. . .that is necessary for the consummation of the plan." *See*, e.g., *In re Riverside Nursing Home*, 137 BR. 134, 137

(Bankr. S.D.N.Y.) aff'd, 977 F.2d 78 (2d Cir. 1992). *In re Legend Radio Group, Inc.*, 248 BR. 281, 286 (W.D. Va. 1999) ("The Bankruptcy Code provides that confirmed plans shall be carried out.")

All of the conditions to effectiveness of the Chapter 11 Plan have been satisfied and the objections to consummation overruled.

Sections 105 and 1142(b) of the Bankruptcy Code provide courts with broad authority to order parties to comply with reorganization plans. 8 Collier On Bankruptcy ¶ 1143.02[1] (15th Rev. Ed. 2003). ("Acting pursuant to section 1142(b), the court may issue any order necessary for the implementation of the plan").

It is incumbent upon the Court to make certain that the Plan which the creditors overwhelmingly supported is given effect. The alternative, conversion to chapter 7, would spell disaster for creditors and customers.

Debtors succeeded in confirming the Plan and also repaid in full their prepetition revolving debt and $20 million of principal owed to the First Lien Lenders, reduced legacy liabilities and provided for a distribution to unsecured creditors. The Plan provides for a chapter 11 liquidation by means of the Lender Liquidating Trust if the sale of all or substantially all of Debtors' assets is not completed by the Plan APA Deadline. The Court's ruling gives effect to the Plan's contingency, preserves the benefits of agreements reached during these cases, and avoids the precipitous loss of jobs and the shut down of automobile production.

## CONCLUSION

Accordingly, the Debtors have satisfied all of the pre-conditions for the implementation of the Plan.

Dated: September 2, 2009

KEVIN GROSS, U.S.B.J.